## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 14 2015, 8:32 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

Nancy A. McCaslin
James L. McCaslin
McCaslin & McCaslin
Elkhart, Indiana

ATTORNEYS FOR APPELLEE

Brent E. Inabit
Christopher M. Keefer
Sopko, Nussbaum, Inabit & Kaczmarek
South Bend, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Mobile Tire and Axle, Inc., et al.,

*Appellants-Defendants,*

v.

Superior Tire, LLC, et al.,

*Appellees-Plaintiffs*

July 14, 2015

Court of Appeals Case No.
20A03-1411-PL-416

Appeal from the Elkhart Superior Court

The Honorable Charles Carter Wicks, Judge

Case No. 20D05-1111-PL-12

**Vaidik, Chief Judge.**

# Case Summary

In October 2014, a jury found that the owners of Mobile Tire and Axle, Inc. (Mobile) had sabotaged the products of another company, Superior Tire, LLC (Superior). The jury awarded Superior $287,366.35 in damages. On appeal,

Mobile contends that the trial court erred by refusing to lift an order in limine, the jury's verdict is not supported by the evidence, and the jury's damage award is not supported by the evidence. Because we find no merit to any of these claims, we affirm.

# Facts and Procedural History

[1] Mobile and Superior are competitor companies—both sell new and used tires and axles, primarily for mobile homes. Michael and Cheryl Fahlbeck created Mobile in 1991. Mobile is a relatively small, family-run operation. By contrast, Superior—created by Darrell Pritt in 1999—does business throughout the country and has employed as many as seventy-five people at one time.

[2] In 2005, Superior began experiencing unexplained problems with its products. Specifically, its customers began complaining that axle parts were missing, brake lines had been cut, and tires were damaged—all issues that implicated product safety. As a result of these problems, Superior had to perform hundreds of un-reimbursable service repairs, and Darrell fired several employees responsible for quality control. But Superior's product problems continued.

[3] In 2011, one of Mobile's long-time customers took their business to Superior. A few weeks later, the Fahlbecks approached one of their employees, Ryder Tinkey, and asked him to sabotage Superior's products. Tinkey had been employed by Mobile for years and had been involved in dishonest business

practices there, including altering tire ratings and marketing used products as new ones. Tinkey declined the Fahlbecks' sabotage requests. A short time later, he was fired. Tinkey then began contacting Mobile's customers and informing them about Mobile's dishonest business practices.

[4] Tinkey later met with Darrell and told him that the Fahlbecks had been sabotaging Superior's products. Two months later, Superior filed a complaint against Mobile in Elkhart Superior Court, alleging tortious interference with business relationships and unfair competition, and seeking damages. Notably—after experiencing issues with their products for more than six years—Superior's product problems vanished after filing its complaint.

[5] Before trial, Superior filed a motion in limine to prevent Mobile from introducing evidence to support its claim that Tinkey was fired for using drugs. The trial court granted the motion but ruled that the order in limine would be lifted "in the event that [] Tinkey or others intentionally introduce evidence of any allegation that [] Tinkey was wrongfully discharged from the employment of Mobile[.]" Appellant's App. p. 1042-43. A three-day jury trial began in October 2014. During the trial, Superior put forth extensive evidence of the product problems it experienced from 2005 to 2011. Darrell described how "2005 was the year that got my attention" because his "repair rate probably tripled, if not quadrupled . . . ." Tr. p. 464. He testified that key product parts, such as dust caps, cotter pins, spindle nuts, and brake wires, simply went missing. *Id.* at 465-66, 468. Superior also experienced problems with its tires— tires were suddenly going flat "with slices in them and cuts in them." *Id.* at 471.

This was happening "all over the place, everywhere," and as a result, Superior was replacing tires "all the time. And it got costly, very costly." *Id.* Notably, Darrell testified that these problems occurred after the products had passed Superior's inspection. *Id.* More than one Superior employee was fired during this time, including Darrell's best foreman, but the company's problems continued. *Id.* at 478, 480.

[6] Darrell told the jury that he "repaired everything. Not one time did I not repair. Not one time. Replaced [the products] a lot." Superior did not charge its customers for these repairs—Darrell testified that the company performed 250 to 300 repairs—or for replacements. *Id.* at 477, 494. Darrell estimated that these repairs cost approximately $90,000, but Mobile estimated the repair costs to be $67,366.35. *Id.* at 666, 945. Both of these estimates were presented to the jury. Darrell also testified that Superior lost goodwill with its customers. He defined goodwill as:

> being able to . . . walk in your customer's door . . . unannounced, just walk in and check on your product and them be glad to see you. That's goodwill to me. Goodwill to me is, if they have a problem when they call you up, they're not chewing your butt out. They're calling you up because they've got faith in you. They believe you're going to fix the problem; they know you're gonna be there for them. To me, that's – that's priceless. That's the root of our business. That's [what] we base our company's [sic] on – when our customer [is] trusting us. That's important.

*Id.* at 555. He estimated that Superior lost $500 to $1000 per month in customer goodwill from 2005 to 2014. *Id.* at 714. Mobile did not question Darrell about this estimate.

[7] According to Darrell, everything changed after he received a call from Tinkey in June 2011. As Darrell described it, Tinkey knew things about Superior's product problems that he "shouldn't have known":

> He shouldn't have known some of the problems I was having. He shouldn't have known about my cotter pins. He shouldn't have known about my U-bolt issues. He shouldn't have known about brake wires. None of this stuff he should have known. He doesn't work with me. I don't know this guy from Adam. Never talked to him before in my life.

*Id.* at 546. Tinkey told Darrell that his product problems had been caused by "Mobile Tire and Axle. Mi[chael] and Cheryl." *Id.* at 547.

[8] Tinkey testified for Superior. He described his involvement in dishonest business practices at Mobile, including altering Mobile's products to satisfy customer orders when inventory ran low, *id.* at 614-17, and marketing used products as new ones, *id.* at 619. Tinkey testified that he did these things because the Fahlbecks told him to, and "I needed the job, and I knew, if I didn't do it, that they'd just fire me and hire somebody else." *Id.* at 618. Tinkey told the jury that Cheryl approached him in 2011 and asked him to sabotage Superior's products: "Cheryl looked at me and the other colleague [with me] and said: would you guys be interested in sabotaging Superior's axles . . . I cannot get Mi[chael] to do it anymore. He used to do it, but I can't get him to do it anymore." *Id.* at 628. Tinkey testified that Cheryl asked him to go to Superior's customer's businesses and "pull[] cotter pins, cut[] brake wires, loosen[] U-bolts, knock[] off dust caps." *Id.* at 629. Tinkey initially "shined [Cheryl] on," and agreed to do so in order "to keep her happy," but he later

refused the request, even after Cheryl approached him a second time. *Id.* at 635, 637. When asked why Mobile would want to sabotage Superior's products, Tinkey explained that it would "make [Darrell] look bad. Make him lose accounts. A company is not going to want to buy stuff . . . that they're constantly having problems with." *Id.* at 636. Tinkey confirmed that it was possible to sabotage Superior's products because Mobile's employees had access to customer facilities where Superior's products were stored. *Id.*

[9] Tinkey testified that after he was fired, he began contacting Mobile's customers to warn them that Mobile altered their products. *Id.* at 639. Then he contacted Darrell and told him "the stuff that Cheryl had asked me . . . to do[.]" *Id.* at 642. When asked why he contacted Darrell, Tinkey responded that "he was getting the short end of the stick in it all. You know, it was sabotaging axles. You're gonna get somebody killed." *Id.* at 645. He denied contacting Mobile's customers and Darrell to retaliate for his firing and emphasized his safety concerns: "[Y]ou've got something that's going down the road. You know, it's not like sabotaging somebody's hamburger at McDonald's. You know, this is a mobile home that weighs thousands and thousands of pounds, and you're gonna get somebody hurt or killed. *Id.* at 646.

[10] Superior also called Jerry Winter, one of Mobile's customers, as a witness. Tinkey had contacted Winter to warn him about Mobile's altered products. When asked about Tinkey, Winter responded:

> I don't remember the exact conversation [with Tinkey], but he told me
> that he was an ex-employee of Mobile Tire and that he had been fired

> for refusing to do things that they instructed him to do. And one of those things was to alter the load rating on the tires that they were shipping to their customers.

*Id.* at 729. When asked if he knew anything about Superior's products being sabotaged, Winter said he did not. *Id.* at 748. Mobile did not object or seek to lift the order in limine at this time.

Later, when Michael Fahlbeck took the stand, Mobile sought to lift the order in limine based on Winter's statement about Tinkey's firing. *Id.* at 834. Counsel conceded, however, that Superior had not intentionally elicited Winter's testimony about Tinkey's firing. *Id.* at 840, 844-45. The trial court denied the request to lift the order in limine. *Id.* at 845.

[11] The Fahlbecks denied sabotaging Superior's products. *Id.* at 850, 908. Cheryl, in particular, testified that Tinkey was lying and that she never asked him to sabotage Superior's products on Mobile's behalf. *Id.* at 908.

[12] The jury found that Mobile, via the Fahlbecks, had "tortiously interfered with . . . Superior['s] . . . business relationships and engaged in unfair competition through their sabotage actions [sic]," and awarded Superior $187,366.35 in compensatory damages—$67,366.35 in repair costs and $120,000 in lost customer goodwill. Appellant's App. p. 21. The jury also awarded Superior $100,000 in punitive damages, for a total damage award of $287,366.35. *Id.*

[13] Mobile now appeals.

# Discussion and Decision

[14] Mobile makes three arguments on appeal.[1] It contends that the trial court erred by refusing to lift the order in limine regarding Tinkey's firing, the jury's verdict is not supported by the evidence, and the jury's damage award is not supported by the evidence.

# 1. Motion in Limine

[15] Mobile argues that the trial court erred when it refused to lift the order in limine regarding Tinkey's employment. We disagree.

[16] We review a trial court's ruling on a pretrial motion in limine for an abuse of discretion. *Chacon v. Jones-Schilds,* 904 N.E.2d 286, 288-89 (Ind. Ct. App. 2009). The trial court's grant of such motions is an adjunct of its inherent authority to admit and exclude evidence. *Butler v. Kokomo Rehab. Hosp., Inc.,* 744 N.E.2d 1041, 1046 (Ind. Ct. App. 2001), *trans. denied.* We will reverse only if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.*

[17] Superior filed a motion in limine to prevent Mobile from introducing evidence to support Mobile's claim that Tinkey was fired for using drugs. The trial court

---

[1] Mobile raises two additional challenges that we do not address; specifically, that the trial court erred in instructing the jury on spoliation of evidence and Superior's damages should be limited by the relevant statute of limitations and the time period Superior functioned as a limited-liability corporation. Mobile admits that it did not object to the spoliation-of-evidence instruction or make any statute-of-limitations or LLC-related arguments at trial. It nonetheless asks us to address its claims under the fundamental-error doctrine. But we apply the fundamental-error doctrine sparingly in civil cases—typically where a person's liberty or parental rights are at stake. *See Johnson v. Wait*, 947 N.E.2d 951, 957-58 (Ind. Ct. App. 2011) (citing *S.M. v. Elkhart Cnty. Office of Family & Children,* 706 N.E.2d 596, 599 n.3 (Ind. Ct. App. 1999)), *trans. denied.* This is not such a case; as a result, these arguments are waived.

granted the motion but ruled that the order in limine would be lifted "in the event that [] Tinkey or others intentionally introduce evidence of any allegation that [] Tinkey was wrongfully discharged from the employment of Mobile[.]" Appellant's App. p. 1042-43. One of Superior's witnesses, Jerry Winter, later testified about Tinkey, saying:

> I don't remember the exact conversation [with Tinkey], but he told me that he was an ex-employee of Mobile Tire and that he had been fired for refusing to do things that they instructed him to do. And one of those things was to alter the load rating on the tires that they were shipping to their customers.

Tr. p. 729. When asked if he knew anything about Superior's products being sabotaged, Winter said he did not. *Id.* at 748. Mobile did not object or seek to lift the order in limine at this time. Later, when Michael Fahlbeck took the stand, Mobile sought to lift the order in limine based on Winter's statement. The trial court denied Mobile's request.

[18] The court's denial was proper. Winter stated that Tinkey "had been fired for refusing to do things that they instructed him to do." The sentence that immediately follows makes it clear that Winter was discussing Tinkey's treatment of *Mobile's* products: "and one of those things was to alter the load rating on the tires that they were shipping to their customers." Indeed, Tinkey admitted that he had altered Mobile's products at the Fahlbecks' direction. Winter's testimony, while referencing Tinkey's firing, had nothing to do with the central issue in the case—the Fahlbecks' involvement in sabotaging Superior's products. Winter made that clear when he stated that he had no knowledge of Superior's products being sabotaged. *See id.* Contrary to

Mobile's claim, "the bad acts . . . inferred" from Winter's testimony were not the basis of the lawsuit. *See* Appellant's Br. p. 53. We find no error here.

## 2. Jury's Verdict

Mobile next argues that the jury's tortious-interference verdict was against the weight of the evidence. On appeal, we will only reverse a jury's verdict when "there is a total failure of evidence or where the jury's verdict is contrary to the uncontradicted evidence." *Ohio Farmers Ins. Co. v. Ind. Drywall & Acoustics, Inc.,* 970 N.E.2d 674, 686 (Ind. Ct. App. 2012), *trans. denied.* We will not reweigh the evidence or judge the credibility of witnesses. *Id.* Instead, we will "determine whether the jury's verdict is supported by substantial evidence of probative value." *Id.* In doing so, "[t]he evidence and all reasonable inferences drawn therefrom will be viewed in favor of the verdict." *Id.*

The elements of tortious interference with a business relationship are: "(1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship." *Levee v. Beeching,* 729 N.E.2d 215, 222 (Ind. Ct. App. 2000) (citation omitted). Mobile argues that "the record does not establish that the defendants were aware of the business relationships Superior [] had, [or] the places where the problems occurred . . . ." Appellant's Br. p. 67-68. But Tinkey testified that Cheryl asked him to sabotage Superior's products because her husband Michael—who had been sabotaging

Superior's products for years—refused to continue. Tinkey also testified that it was possible to sabotage Superior's products because Mobile's employees had access to customer facilities where Superior's products were stored. The jury certainly could have concluded that Mobile intentionally interfered with Superior's business relationships based on this testimony, as well as the fact that Superior's product problems ceased just weeks after filing its complaint against Mobile.

Mobile additionally argues that "no one saw the defendants sabotage any of Superior's products, and the defendants denied sabotaging Superior's products. The evidence in this case stems from the unsupported testimony of a former employee who was fired and whose motives for his testimony were not permitted to be disclosed to the jury." *Id.* at 68. This argument is nothing more than an invitation to reweigh the evidence and judge Tinkey's credibility, which we may not do. We find no error here.

# 3. Damage Award

Mobile also argues that the jury's damage award is not supported by the evidence. After finding that Mobile had tortiously interfered with Superior's business relationships, the jury awarded Superior $187,366.35 in compensatory damages—$67,366.35 in repair costs and $120,000 in lost customer goodwill. The jury also awarded Superior $100,000 in punitive damages, for a total damage award of $287,366.35.

[23] A jury is to be afforded great latitude in making damage-award determinations. *City of Carmel v. Leeper Elec. Servs., Inc.*, 805 N.E.2d 389, 393 (Ind. Ct. App. 2004) (citation omitted), *trans. denied*. A verdict will be upheld if the award falls within the bounds of the evidence. *Id.* (citations omitted). The trial court may only reverse a jury verdict "when it is apparent from a review of the evidence that the amount of damages awarded by the jury is so small or so great as to clearly indicate that the jury was motivated by prejudice, passion, partiality, corruption, or that it considered an improper element." *Id.* (citation omitted).

[24] Superior put forth substantial evidence of the damages it experienced as a result of Mobile's sabotage. Darrell, Superior's owner, testified that key product parts, such as dust caps, cotter pins, spindle nuts, and brake wires, simply went missing. Tr. p. 465-66, 468. Superior also experienced problems with its tires— tires were suddenly going flat "with slices in them and cuts in them." *Id.* at 471. This was happening "all over the place, everywhere," and as a result, Superior was replacing tires "all the time. And it got costly, very costly." *Id.* Darrell told the jury that he "repaired everything. Not one time did I not repair. Not one time. Replaced [the products] a lot." Superior did not charge its customers for these repairs—Darrell testified that the company performed 250 to 300 repairs—or for replacements. *Id.* at 477, 494. Darrell estimated that these repairs and replacements cost approximately $90,000. Mobile, however, estimated the costs to be $67,366.35. Both of these estimates were presented to the jury. Darrell also testified that Superior lost customer goodwill. He defined goodwill as:

being able to . . . walk in your customer's door . . . unannounced, just walk in and check on your product and them be glad to see you. That's goodwill to me. Goodwill to me is, if they have a problem when they call you up, they're not chewing your butt out. They're calling you up because they've got faith in you. They believe you're going to fix the problem; they know you're gonna be there for them. To me, that's – that's priceless. That's the root of our business. That's [what] we base our company's [sic] on – when our customer's trusting us. That's important.

*Id.* at 555. He estimated that Superior lost $500 to $1000 per month in customer goodwill from 2005 to 2014. *Id.* at 714. Mobile did not question Darrell about this estimate.

[25] The jury accepted Mobile's $67,366.35 repair estimate. Mobile's sole argument regarding the damage award for repairs is that "[Darrell] . . . did not testify that Mobile [] or the Fahlbecks had knowledge of where Superior's products were located or that the defendants knew of the existence of business relationships between Superior Tire and specific companies." Appellant's Br. p. 62. This is a sufficiency argument, and we have already affirmed the jury's tortious-interference verdict. We find no error with respect to the $67,366.35 damage award for repair costs. As for the lost-goodwill award, Mobile argues that Darrell's testimony did not sufficiently establish that Superior lost goodwill with its customers. But Mobile did not challenge Darrell's testimony, nor did it seek additional specificity or details from Darrell on cross-examination. We also find no error with regard to the jury's lost-goodwill damage award.

[26] Finally, as for the $100,000 punitive-damages award,[2] Mobile makes another unpersuasive sufficiency-of-the-evidence challenge: "the jury erred when it awarded punitive damages because the evidence was not clear and convincing [that] the defendants committed acts of sabotage." As stated above, we have already affirmed the jury's verdict. We find no error with respect to the jury's punitive-damage award.

[27] Affirmed.

Kirsch, J., and Bradford, J., concur.

---

[2] "A punitive damage award may not be more than the greater of: (1) three (3) times the amount of compensatory damages awarded in the action; or (2) fifty thousand dollars ($50,000)." Ind. Code § 34-51-3-4.